# MISSISSIPPI UNIVERSITY FOR WOMEN ET AL. *v.* HOGAN

No. 81–406.   Argued March 22, 1982—Decided July 1, 1982

O'CONNOR, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and STEVENS, JJ., joined. BURGER, C. J., *post*, p. 733, and BLACKMUN, J., *post*, p. 733, filed dissenting opinions. POWELL, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 735.

*Hunter M. Gholson* argued the cause for petitioners. With him on the briefs were *Bill Allain*, Attorney General of Mississippi, and *Ed Davis Noble, Jr.*, Assistant Attorney General.

*Wilbur O. Colom* argued the cause for respondent. With him on the brief was *W. Wayne Drinkwater, Jr.**

JUSTICE O'CONNOR delivered the opinion of the Court.

This case presents the narrow issue of whether a state statute that excludes males from enrolling in a state-supported professional nursing school violates the Equal Protection Clause of the Fourteenth Amendment.

I

The facts are not in dispute. In 1884, the Mississippi Legislature created the Mississippi Industrial Institute and Col-

*\*Zona Fairbanks Hostetler, Suellen Terrill Keiner, Phyllis N. Segal, Marcia D. Greenberger*, and *Judith L. Lichtman* filed a brief for the National Women's Law Center et al. as *amici curiae* urging affirmance.

lege for the Education of White Girls of the State of Mississippi, now the oldest state-supported all-female college in the United States. 1884 Miss. Gen. Laws, Ch. 30, § 6. The school, known today as Mississippi University for Women (MUW), has from its inception limited its enrollment to women.[1]

In 1971, MUW established a School of Nursing, initially offering a 2-year associate degree. Three years later, the school instituted a 4-year baccalaureate program in nursing and today also offers a graduate program. The School of Nursing has its own faculty and administrative officers and establishes its own criteria for admission.[2]

Respondent, Joe Hogan, is a registered nurse but does not hold a baccalaureate degree in nursing. Since 1974, he has worked as a nursing supervisor in a medical center in Columbus, the city in which MUW is located. In 1979, Hogan applied for admission to the MUW School of Nursing's baccalaureate program.[3] Although he was otherwise qualified, he

---

[1] The charter of MUW, basically unchanged since its founding, now provides:

"The purpose and aim of the Mississippi State College for Women is the moral and intellectual advancement of the girls of the state by the maintenance of a first-class institution for their education in the arts and sciences, for their training in normal school methods and kindergarten, for their instruction in bookkeeping, photography, stenography, telegraphy, and typewriting, and in designing, drawing, engraving, and painting, and their industrial application, and for their instruction in fancy, general and practical needlework, and in such other industrial branches as experience, from time to time, shall suggest as necessary or proper to fit them for the practical affairs of life." Miss. Code Ann. § 37–117–3 (1972).

Mississippi maintains no other single-sex public university or college. Thus, we are not faced with the question of whether States can provide "separate but equal" undergraduate institutions for males and females. Cf. *Vorchheimer* v. *School District of Philadelphia*, 532 F. 2d 880 (CA3 1975), aff'd by an equally divided Court, 430 U. S. 703 (1977).

[2] Record, Exhibit 1, 1980–1981 Bulletin of Mississippi University for Women 31–34, 212–229.

[3] With a baccalaureate degree, Hogan would be able to earn a higher salary and would be eligible to obtain specialized training as an anesthetist. Tr. 18.

was denied admission to the School of Nursing solely because of his sex. School officials informed him that he could audit the courses in which he was interested, but could not enroll for credit. Tr. 26.[4]

Hogan filed an action in the United States District Court for the Northern District of Mississippi, claiming the single-sex admissions policy of MUW's School of Nursing violated the Equal Protection Clause of the Fourteenth Amendment. Hogan sought injunctive and declaratory relief, as well as compensatory damages.

Following a hearing, the District Court denied preliminary injunctive relief. App. to Pet. for Cert. A4. The court concluded that maintenance of MUW as a single-sex school bears a rational relationship to the State's legitimate interest "in providing the greatest practical range of educational opportunities for its female student population." *Id.*, at A3. Furthermore, the court stated, the admissions policy is not arbitrary because providing single-sex schools is consistent with a respected, though by no means universally accepted, educational theory that single-sex education affords unique benefits to students. *Ibid.* Stating that the case presented no issue of fact, the court informed Hogan that it would enter summary judgment dismissing his claim unless he tendered a factual issue. When Hogan offered no further evidence, the District Court entered summary judgment in favor of the State. Record 73.

The Court of Appeals for the Fifth Circuit reversed, holding that, because the admissions policy discriminates on the basis of gender, the District Court improperly used a "rational relationship" test to judge the constitutionality of the policy. 646 F. 2d 1116, 1118 (1981). Instead, the Court of Appeals stated, the proper test is whether the State has carried the heavier burden of showing that the gender-based classification is substantially related to an important govern-

---

[4] Dr. James Strobel, President of MUW, verified that men could audit the equivalent of a full classload in either night or daytime classes. *Id.*, at 39–40.

mental objective. *Id.*, at 1118, 1119. Recognizing that the State has a significant interest in providing educational opportunities for all its citizens, the court then found that the State had failed to show that providing a unique educational opportunity for females, but not for males, bears a substantial relationship to that interest. *Id.*, at 1119. Holding that the policy excluding Hogan because of his sex denies him equal protection of the laws, the court vacated the summary judgment entered against Hogan as to his claim for monetary damages, and remanded for entry of a declaratory judgment in conformity with its opinion and for further appropriate proceedings. *Id.*, at 1119–1120.

On rehearing, the State contended that Congress, in enacting § 901(a)(5) of Title IX of the Education Amendments of 1972, Pub. L. 92–318, 86 Stat. 373, 20 U. S. C. § 1681 *et seq.*, expressly had authorized MUW to continue its single-sex admissions policy by exempting public undergraduate institutions that traditionally have used single-sex admissions policies from the gender discrimination prohibition of Title IX.[5] Through that provision, the State argued, Congress limited the reach of the Fourteenth Amendment by exercising

---

[5] Section 901(a) of Title IX, Education Amendments of 1972, Pub. L. 92–318, 86 Stat. 373, 20 U. S. C. § 1681(a), provides in part:

"(a) No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that:

"(1) . . . in regard to admissions to educational institutions, this section shall apply only to institutions of vocational education, professional education, and graduate higher education, and to public institutions of undergraduate higher education;

. . . . .

"(5) . . . in regard to admissions this section shall not apply to any public institution of undergraduate higher education which is an institution that traditionally and continually from its establishment has had a policy of admitting only students of one sex. . . ."

its power under § 5 of the Amendment.[6] The Court of Appeals rejected the argument, holding that § 5 of the Fourteenth Amendment does not grant Congress power to authorize States to maintain practices otherwise violative of the Amendment. 653 F. 2d 222 (1981).

We granted certiorari, 454 U. S. 962 (1981), and now affirm the judgment of the Court of Appeals.[7]

## II

We begin our analysis aided by several firmly established principles. Because the challenged policy expressly discriminates among applicants on the basis of gender, it is subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment. *Reed* v. *Reed*, 404 U. S. 71, 75 (1971). That this statutory policy discriminates against males rather than against females does not exempt it from scrutiny or reduce the standard of review.[8] *Caban* v. *Mo-*

---

[6] Section 5 of the Fourteenth Amendment provides:

"The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

[7] Although some statements in the Court of Appeals' decision refer to all schools within MUW, see 646 F. 2d, at 1119, the factual underpinning of Hogan's claim for relief involved only his exclusion from the nursing program, Complaint ¶ 8–10, and the Court of Appeals' holding applies only to Hogan's individual claim for relief. 646 F. 2d, at 1119–1120. Additionally, during oral argument, counsel verified that Hogan sought only admission to the School of Nursing. Tr. of Oral Arg. 24. Because Hogan's claim is thus limited, and because we review judgments, not statements in opinions, *Black* v. *Cutter Laboratories*, 351 U. S. 292 (1956), we decline to address the question of whether MUW's admissions policy, as applied to males seeking admission to schools other than the School of Nursing, violates the Fourteenth Amendment.

[8] Without question, MUW's admissions policy worked to Hogan's disadvantage. Although Hogan could have attended classes and received credit in one of Mississippi's state-supported coeducational nursing programs, none of which was located in Columbus, he could attend only by driving a considerable distance from his home. Tr. 19–20, 63–65. A similarly situ-

*hammed,* 441 U. S. 380, 394 (1979); *Orr* v. *Orr,* 440 U. S. 268, 279 (1979). Our decisions also establish that the party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an "exceedingly persuasive justification" for the classification. *Kirchberg* v. *Feenstra,* 450 U. S. 455, 461 (1981); *Personnel Administrator of Mass.* v. *Feeney,* 442 U. S. 256, 273 (1979). The burden is met only by showing at least that the classification serves "important governmental objectives and that the discriminatory means employed" are "substantially related to the achievement of those objectives." *Wengler* v. *Druggists Mutual Ins. Co.,* 446 U. S. 142, 150 (1980).[9]

Although the test for determining the validity of a gender-based classification is straightforward, it must be applied free

---

ated female would not have been required to choose between forgoing credit and bearing that inconvenience. Moreover, since many students enrolled in the School of Nursing hold full-time jobs, Deposition of Dean Annette K. Barrar 29–30, Hogan's female colleagues had available an opportunity, not open to Hogan, to obtain credit for additional training. The policy of denying males the right to obtain credit toward a baccalaureate degree thus imposed upon Hogan "a burden he would not bear were he female." *Orr* v. *Orr,* 440 U. S. 268, 273 (1979).

[9] In his dissenting opinion, JUSTICE POWELL argues that a less rigorous test should apply because Hogan does not advance a "serious equal protection claim." *Post,* at 742. JUSTICE BLACKMUN, without proposing an alternative test, labels the test applicable to gender-based discrimination as "rigid" and productive of "needless conformity." *Post,* at 734, 735. Our past decisions establish, however, that when a classification expressly discriminates on the basis of gender, the analysis and level of scrutiny applied to determine the validity of the classification do not vary simply because the objective appears acceptable to individual Members of the Court. While the validity and importance of the objective may affect the outcome of the analysis, the analysis itself does not change.

Thus, we apply the test previously relied upon by the Court to measure the constitutionality of gender-based discrimination. Because we conclude that the challenged statutory classification is not substantially related to an important objective, we need not decide whether classifications based upon gender are inherently suspect. See *Stanton* v. *Stanton,* 421 U. S. 7, 13 (1975).

of fixed notions concerning the roles and abilities of males and females. Care must be taken in ascertaining whether the statutory objective itself reflects archaic and stereotypic notions. Thus, if the statutory objective is to exclude or "protect" members of one gender because they are presumed to suffer from an inherent handicap or to be innately inferior, the objective itself is illegitimate. See *Frontiero* v. *Richardson*, 411 U. S. 677, 684–685 (1973) (plurality opinion).[10]

If the State's objective is legitimate and important, we next determine whether the requisite direct, substantial relationship between objective and means is present. The purpose of requiring that close relationship is to assure that the

---

[10] History provides numerous examples of legislative attempts to exclude women from particular areas simply because legislators believed women were less able than men to perform a particular function. In 1873, this Court remained unmoved by Myra Bradwell's argument that the Fourteenth Amendment prohibited a State from classifying her as unfit to practice law simply because she was female. *Bradwell* v. *Illinois*, 16 Wall. 130 (1873). In his opinion concurring in the judgment, Justice Bradley described the reasons underlying the State's decision to determine which positions only men could fill:

"It is the prerogative of the legislator to prescribe regulations founded on nature, reason, and experience for the due admission of qualified persons to professions and callings demanding special skill and confidence. This fairly belongs to the police power of the State; and, in my opinion, in view of the peculiar characteristics, destiny, and mission of woman, it is within the province of the legislature to ordain what offices, positions, and callings shall be filled and discharged by men, and shall receive the benefit of those energies and responsibilities, and that decision and firmness which are presumed to predominate in the sterner sex." *Id.*, at 142.

In a similar vein, the Court in *Goesaert* v. *Cleary*, 335 U. S. 464, 466 (1948), upheld a legislature's right to preclude women from bartending, except under limited circumstances, on the ground that the legislature could devise preventive measures against "moral and social problems" that result when women, but apparently not men, tend bar. Similarly, the many protective labor laws enacted in the late 19th and early 20th centuries often had as their objective the protection of weaker workers, which the laws assumed meant females. See generally B. Brown, A. Freedman, H. Katz, & A. Price, Women's Rights and the Law 209–210 (1977).

validity of a classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions about the proper roles of men and women.[11] The need for the requirement is amply revealed by reference to the broad range of statutes already invalidated by this Court, statutes that relied upon the simplistic, outdated assumption that gender could be used as a "proxy for other, more germane bases of classification," *Craig* v. *Boren*, 429 U. S. 190, 198 (1976), to establish a link between objective and classification.[12]

---

[11] For instance, in *Stanton* v. *Stanton, supra,* this Court invalidated a state statute that specified a greater age of majority for males than for females and thereby affected the period during which a divorced parent was responsible for supporting his children. We did not question the importance or validity of the State's interest in defining parents' obligation to support children during their minority. On analysis, however, we determined that the purported relationship between that objective and the gender-based classification was based upon traditional assumptions that "the female [is] destined solely for the home and the rearing of the family, and only the male for the marketplace and the world of ideas. . . . If a specified age of minority is required for the boy in order to assure him parental support while he attains his education and training, so, too, is it for the girl." 421 U. S., at 14–15. Once those traditional notions were abandoned, no basis for finding a substantial relationship between classification and objective remained.

[12] See, *e. g., Kirchberg* v. *Feenstra,* 450 U. S. 455 (1981) (statute granted only husbands the right to manage and dispose of jointly owned property without the spouse's consent); *Wengler* v. *Druggists Mutual Ins. Co.,* 446 U. S. 142 (1980) (statute required a widower, but not a widow, to show he was incapacitated from earning to recover benefits for a spouse's death under workers' compensation laws); *Orr* v. *Orr, supra* (only men could be ordered to pay alimony following divorce); *Craig* v. *Boren,* 429 U. S. 190 (1976) (women could purchase "nonintoxicating" beer at a younger age than could men); *Stanton* v. *Stanton, supra* (women reached majority at an earlier age than did men); *Weinberger* v. *Wiesenfeld,* 420 U. S. 636 (1975) (widows, but not widowers, could collect survivors' benefits under the Social Security Act); *Frontiero* v. *Richardson,* 411 U. S. 677 (1973) (determination of spouse's dependency based upon gender of member of Armed Forces claiming dependency benefits); *Reed* v. *Reed,* 404 U. S. 71 (1971) (statute preferred men to women as administrators of estates).

Applying this framework, we now analyze the arguments advanced by the State to justify its refusal to allow males to enroll for credit in MUW's School of Nursing.

## III

### A

The State's primary justification for maintaining the single-sex admissions policy of MUW's School of Nursing is that it compensates for discrimination against women and, therefore, constitutes educational affirmative action. Brief for Petitioners 8.[13] As applied to the School of Nursing, we find the State's argument unpersuasive.

---

[13] In the reply brief, the State understandably retreated from its contention that MUW was founded to provide opportunities for women which were not available to men. Reply Brief for Petitioners 4. Apparently, the impetus for founding MUW came not from a desire to provide women with advantages superior to those offered men, but rather from a desire to provide white women in Mississippi access to state-supported higher learning. In 1856, Sally Reneau began agitating for a college for white women. Those initial efforts were unsuccessful, and, by 1870, Mississippi provided higher education only for white men and black men and women. E. Mayes, History of Education in Mississippi 178, 228, 245, 259, 266, 270 (1899) (hereinafter Mayes). See also S. Neilson, The History of Mississippi State College for Women 4–5 (unpublished manuscript, 1952) (hereinafter Neilson). In 1882, two years before MUW was chartered, the University of Mississippi opened its doors to women. However, the institution was in those early years not "extensively patronized by females; most of those who come being such as desire to qualify themselves to teach." Mayes, at 178. By 1890, the largest number of women in any class at the University had been 23, while nearly 350 women enrolled in the first session of MUW. Id., at 178, 253. Because the University did not solicit the attendance of women until after 1920, and did not accept women at all for a time between 1907 and 1920, most Mississippi women who attended college attended MUW. Neilson, at 86. Thus, in Mississippi, as elsewhere in the country, women's colleges were founded to provide some form of higher education for the academically disenfranchised. See generally 2 T. Woody, A History of Women's Education in the United States 137–223 (1929); L. Baker, I'm Radcliffe! Fly Me! The Seven Sisters and the Failure of Women's Education 22, 136–141 (1976).

In limited circumstances, a gender-based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened. See *Schlesinger* v. *Ballard,* 419 U. S. 498 (1975). However, we consistently have emphasized that "the mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme." *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 648 (1975). The same searching analysis must be made, regardless of whether the State's objective is to eliminate family controversy, *Reed* v. *Reed,* 404 U. S. 71 (1971), to achieve administrative efficiency, *Frontiero* v. *Richardson,* 411 U. S. 677 (1973), or to balance the burdens borne by males and females.

It is readily apparent that a State can evoke a compensatory purpose to justify an otherwise discriminatory classification only if members of the gender benefited by the classification actually suffer a disadvantage related to the classification. We considered such a situation in *Califano* v. *Webster,* 430 U. S. 313 (1977), which involved a challenge to a statutory classification that allowed women to eliminate more low-earning years than men for purposes of computing Social Security retirement benefits. Although the effect of the classification was to allow women higher monthly benefits than were available to men with the same earning history, we upheld the statutory scheme, noting that it took into account that women "as such have been unfairly hindered from earning as much as men" and "work[ed] directly to remedy" the resulting economic disparity. *Id.,* at 318.

A similar pattern of discrimination against women influenced our decision in *Schlesinger* v. *Ballard, supra.* There, we considered a federal statute that granted female Naval officers a 13-year tenure of commissioned service before mandatory discharge, but accorded male officers only a 9-year tenure. We recognized that, because women were barred from combat duty, they had had fewer opportunities for promotion than had their male counterparts. By allow-

ing women an additional four years to reach a particular rank before subjecting them to mandatory discharge, the statute directly compensated for other statutory barriers to advancement.

In sharp contrast, Mississippi has made no showing that women lacked opportunities to obtain training in the field of nursing or to attain positions of leadership in that field when the MUW School of Nursing opened its door or that women currently are deprived of such opportunities. In fact, in 1970, the year before the School of Nursing's first class enrolled, women earned 94 percent of the nursing baccalaureate degrees conferred in Mississippi and 98.6 percent of the degrees earned nationwide. U. S. Dept. of Health, Education, and Welfare, Earned Degrees Conferred: 1969–1970, Institutional Data 388 (1972). That year was not an aberration; one decade earlier, women had earned all the nursing degrees conferred in Mississippi and 98.9 percent of the degrees conferred nationwide. U. S. Dept. of Health, Education, and Welfare, Earned Degrees Conferred, 1959–1960: Bachelor's and Higher Degrees 135 (1960). As one would expect, the labor force reflects the same predominance of women in nursing. When MUW's School of Nursing began operation, nearly 98 percent of all employed registered nurses were female.[14] United States Bureau of Census, 1981 Statistical Abstract of the United States 402 (1981).

Rather than compensate for discriminatory barriers faced by women, MUW's policy of excluding males from admission to the School of Nursing tends to perpetuate the stereotyped view of nursing as an exclusively woman's job.[15] By assuring

---

[14] Relatively little change has taken place during the past 10 years. In 1980, women received more than 94 percent of the baccalaureate degrees conferred nationwide, National Center for Education Statistics, 1981 Digest of Education Statistics 121 (1981), and constituted 96.5 percent of the registered nurses in the labor force. United States Bureau of Census, 1981 Statistical Abstract of the United States 402 (1981).

[15] Officials of the American Nurses Association have suggested that excluding men from the field has depressed nurses' wages. Hearings before

that Mississippi allots more openings in its state-supported nursing schools to women than it does to men, MUW's admissions policy lends credibility to the old view that women, not men, should become nurses, and makes the assumption that nursing is a field for women a self-fulfilling prophecy. See *Stanton* v. *Stanton*, 421 U. S. 7 (1975). Thus, we conclude that, although the State recited a "benign, compensatory purpose," it failed to establish that the alleged objective is the actual purpose underlying the discriminatory classification.[16]

The policy is invalid also because it fails the second part of the equal protection test, for the State has made no showing that the gender-based classification is substantially and directly related to its proposed compensatory objective. To the contrary, MUW's policy of permitting men to attend classes as auditors fatally undermines its claim that women, at least those in the School of Nursing, are adversely affected by the presence of men.

---

the United States Equal Employment Opportunity Commission on Job Segregation and Wage Discrimination 510–511, 517–518, 523 (Apr. 1980). To the extent the exclusion of men has that effect, MUW's admissions policy actually penalizes the very class the State purports to benefit. Cf. *Weinberger* v. *Wiesenfeld*, 420 U. S. 636 (1975).

[16] Even were we to assume that discrimination against women affects their opportunity to obtain an education or to obtain leadership roles in nursing, the challenged policy nonetheless would be invalid, for the State has failed to establish that the legislature intended the single-sex policy to compensate for any perceived discrimination. Cf. *Califano* v. *Webster*, 430 U. S. 313, 318 (1977) (legislative history of the compensatory statute revealed that Congress "directly addressed the justification for differing treatment of men and women" and "purposely enacted the more favorable treatment for female wage earners . . ."). The State has provided no evidence whatever that the Mississippi Legislature has ever attempted to justify its differing treatment of men and women seeking nurses' training. Indeed, the only statement of legislative purpose is that in § 37–117–3 of the Mississippi Code, see n. 1, *supra*, a statement that relies upon the very sort of archaic and overbroad generalizations about women that we have found insufficient to justify a gender-based classification. *E. g.*, *Orr* v. *Orr*, 440 U. S. 268 (1979); *Stanton* v. *Stanton*, 421 U. S. 7 (1975).

MUW permits men who audit to participate fully in classes. Additionally, both men and women take part in continuing education courses offered by the School of Nursing, in which regular nursing students also can enroll. Deposition of Dr. James Strobel 56–60 and Deposition of Dean Annette K. Barrar 24–26. The uncontroverted record reveals that admitting men to nursing classes does not affect teaching style, Deposition of Nancy L. Herban 4, that the presence of men in the classroom would not affect the performance of the female nursing students, Tr. 61 and Deposition of Dean Annette K. Barrar 7–8, and that men in coeducational nursing schools do not dominate the classroom. Deposition of Nancy Herban 6. In sum, the record in this case is flatly inconsistent with the claim that excluding men from the School of Nursing is necessary to reach any of MUW's educational goals.

Thus, considering both the asserted interest and the relationship between the interest and the methods used by the State, we conclude that the State has fallen far short of establishing the "exceedingly persuasive justification" needed to sustain the gender-based classification. Accordingly, we hold that MUW's policy of denying males the right to enroll for credit in its School of Nursing violates the Equal Protection Clause of the Fourteenth Amendment.[17]

## B

In an additional attempt to justify its exclusion of men from MUW's School of Nursing, the State contends that MUW is

---

[17] JUSTICE POWELL's dissent suggests that a second objective is served by the gender-based classification in that Mississippi has elected to provide women a choice of educational environments. *Post*, at 742–744. Since any gender-based classification provides one class a benefit or choice not available to the other class, however, that argument begs the question. The issue is not whether the benefited class profits from the classification, but whether the State's decision to confer a benefit only upon one class by means of a discriminatory classification is substantially related to achieving a legitimate and substantial goal.

the direct beneficiary "of specific congressional legislation which, on its face, permits the institution to exist as it has in the past." Brief for Petitioners 19. The argument is based upon the language of § 901(a) in Title IX of the Education Amendments of 1972, 20 U. S. C. § 1681(a). Although § 901(a) prohibits gender discrimination in education programs that receive federal financial assistance, subsection 5 exempts the admissions policies of undergraduate institutions "that traditionally and continually from [their] establishment [have] had a policy of admitting only students of one sex" from the general prohibition. See n. 5, *supra*. Arguing that Congress enacted Title IX in furtherance of its power to enforce the Fourteenth Amendment, a power granted by § 5 of that Amendment, the State would have us conclude that § 901(a)(5) is but "a congressional limitation upon the broad prohibitions of the Equal Protection Clause of the Fourteenth Amendment." Brief for Petitioners 20.

The argument requires little comment. Initially, it is far from clear that Congress intended, through § 901(a)(5), to exempt MUW from any constitutional obligation. Rather, Congress apparently intended, at most, to exempt MUW from the requirements of Title IX.

Even if Congress envisioned a constitutional exemption, the State's argument would fail. Section 5 of the Fourteenth Amendment gives Congress broad power indeed to enforce the command of the Amendment and "to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion . . . ." *Ex parte Virginia*, 100 U. S. 339, 346 (1880). Congress' power under § 5, however, "is limited to adopting measures to enforce the guarantees of the Amendment; § 5 grants Congress no power to restrict, abrogate, or dilute these guarantees." *Katzenbach* v. *Morgan*, 384 U. S. 641, 651, n. 10 (1966). Although we give deference to congressional decisions and classifications, neither Congress nor a State can validate a law that denies the rights guaranteed by the Four-

teenth Amendment. See, *e. g., Califano* v. *Goldfarb*, 430 U. S. 199, 210 (1977); *Williams* v. *Rhodes*, 393 U. S. 23, 29 (1968).

The fact that the language of § 901(a)(5) applies to MUW provides the State no solace: "[A] statute apparently governing a dispute cannot be applied by judges, consistently with their obligations under the Supremacy Clause, when such an application of the statute would conflict with the Constitution. *Marbury* v. *Madison*, 1 Cranch 137 (1803)." *Younger* v. *Harris*, 401 U. S. 37, 52 (1971).

## IV

Because we conclude that the State's policy of excluding males from MUW's School of Nursing violates the Equal Protection Clause of the Fourteenth Amendment, we affirm the judgment of the Court of Appeals.

*It is so ordered.*

CHIEF JUSTICE BURGER, dissenting.

I agree generally with JUSTICE POWELL's dissenting opinion. I write separately, however, to emphasize that the Court's holding today is limited to the context of a professional nursing school. *Ante*, at 723, n. 7, 727. Since the Court's opinion relies heavily on its finding that women have traditionally dominated the nursing profession, see *ante*, at 729–731, it suggests that a State might well be justified in maintaining, for example, the option of an all-women's business school or liberal arts program.

JUSTICE BLACKMUN, dissenting.

Unless Mississippi University for Women wished to preserve a historical anachronism, one only states the obvious when he observes that the University long ago should have replaced its original statement of purpose and brought its corporate papers into the 20th century. It failed to do so and, perhaps in partial consequence, finds itself in this litigation, with the Court's opinion, *ante*, at 719–720, and n. 1, now

taking full advantage of that failure, to MUW's embarrassment and discomfiture.

Despite that failure, times have changed in the intervening 98 years. What was once an "Institute and College" is now a genuine university, with a 2-year School of Nursing established 11 years ago and then expanded to a 4-year baccalaureate program in 1974. But respondent Hogan "wants in" at this particular location in his home city of Columbus. It is not enough that his State of Mississippi offers baccalaureate programs in nursing open to males at Jackson and at Hattiesburg. Mississippi thus has not closed the doors of its educational system to males like Hogan. Assuming that he is qualified—and I have no reason whatsoever to doubt his qualifications—those doors are open and his maleness alone does not prevent his gaining the additional education he professes to seek.

I have come to suspect that it is easy to go too far with rigid rules in this area of claimed sex discrimination, and to lose—indeed destroy—values that mean much to some people by forbidding the State to offer them a choice while not depriving others of an alternative choice. JUSTICE POWELL in his separate opinion, *post*, p. 735, advances this theme well.

While the Court purports to write narrowly, declaring that it does not decide the same issue with respect to "separate but equal" undergraduate institutions for females and males, *ante*, at 720, n. 1, or with respect to units of MUW other than its School of Nursing, *ante*, at 723, n. 7, there is inevitable spillover from the Court's ruling today. That ruling, it seems to me, places in constitutional jeopardy any state-supported educational institution that confines its student body in any area to members of one sex, even though the State elsewhere provides an equivalent program to the complaining applicant. The Court's reasoning does not stop with the School of Nursing of the Mississippi University for Women.

I hope that we do not lose all values that some think are worthwhile (and are not based on differences of race or reli-

gion) and relegate ourselves to needless conformity. The ringing words of the Equal Protection Clause of the Fourteenth Amendment—what JUSTICE POWELL aptly describes as its "liberating spirit," *post*, at 741—do not demand that price.

JUSTICE POWELL, with whom JUSTICE REHNQUIST joins, dissenting.

The Court's opinion bows deeply to conformity. Left without honor—indeed, held unconstitutional—is an element of diversity that has characterized much of American education and enriched much of American life. The Court in effect holds today that no State now may provide even a single institution of higher learning open only to women students. It gives no heed to the efforts of the State of Mississippi to provide abundant opportunities for young men and young women to attend coeducational institutions, and none to the preferences of the more than 40,000 young women who over the years have evidenced their approval of an all-women's college by choosing Mississippi University for Women (MUW) over seven coeducational universities within the State. The Court decides today that the Equal Protection Clause makes it unlawful for the State to provide women with a traditionally popular and respected choice of educational environment. It does so in a case instituted by one man, who represents no class, and whose primary concern is personal convenience.

It is undisputed that women enjoy complete equality of opportunity in Mississippi's public system of higher education. Of the State's 8 universities and 16 junior colleges, all except MUW are coeducational. At least two other Mississippi universities would have provided respondent with the nursing curriculum that he wishes to pursue.[1] No other

---

[1] "[T]wo other Mississippi universities offered coeducational programs leading to a Bachelor of Science in Nursing—the University of Southern Mississippi in Hattiesburg, 178 miles from Columbus; and the University of

male has joined in his complaint. The only groups with any personal acquaintance with MUW to file *amicus* briefs are female students and alumnae of MUW. And they have emphatically rejected respondent's arguments, urging that the State of Mississippi be allowed to continue offering the choice from which they have benefited.

Nor is respondent significantly disadvantaged by MUW's all-female tradition. His constitutional complaint is based upon a single asserted harm: that he must *travel* to attend the state-supported nursing schools that concededly are available to him. The Court characterizes this injury as one of "inconvenience." *Ante*, at 724, n. 8. This description is fair and accurate, though somewhat embarrassed by the fact that there is, of course, no constitutional right to attend a state-supported university in one's home town. Thus the Court, to redress respondent's injury of inconvenience, must rest its invalidation of MUW's single-sex program on a mode of "sexual stereotype" reasoning that has no application whatever to the respondent or to the "wrong" of which he complains. At best this is anomalous. And ultimately the anomaly reveals legal error—that of applying a heightened equal protection standard, developed in cases of genuine sexual stereotyping, to a narrowly utilized state classification that provides an *additional* choice for women. Moreover, I believe that Mississippi's educational system should be upheld in this case even if this inappropriate method of analysis is applied.

I

Coeducation, historically, is a novel educational theory. From grade school through high school, college, and graduate and professional training, much of the Nation's population during much of our history has been educated in sexually segregated classrooms. At the college level, for instance, until recently some of the most prestigious colleges and universi-

---

Mississippi in Jackson, 147 miles from Columbus . . . ." Brief for Respondent 3. See also Tr. of Oral Arg. 8.

ties—including most of the Ivy League—had long histories of single-sex education. As Harvard, Yale, and Princeton remained all-male colleges well into the second half of this century, the "Seven Sister" institutions established a parallel standard of excellence for women's colleges. Of the Seven Sisters, Mount Holyoke opened as a female seminary in 1837 and was chartered as a college in 1888. Vassar was founded in 1865, Smith and Wellesley in 1875, Radcliffe in 1879, Bryn Mawr in 1885, and Barnard in 1889. Mount Holyoke, Smith, and Wellesley recently have made considered decisions to remain essentially single-sex institutions. See Carnegie Commission on Higher Education, Opportunities for Women in Higher Education 70–75 (1973) (Carnegie Report), excerpted in B. Babcock, A. Freedman, E. Norton, & S. Ross, Sex Discrimination and the Law 1013, 1014 (1975) (Babcock). Barnard retains its independence from Columbia, its traditional coordinate institution. Harvard and Radcliffe maintained separate admissions policies as recently as 1975.[2]

The sexual segregation of students has been a reflection of, rather than an imposition upon, the preference of those subject to the policy. It cannot be disputed, for example, that the highly qualified women attending the leading women's colleges could have earned admission to virtually any college of their choice.[3] Women attending such colleges have cho-

---

[2] The history, briefly summarized above, of single-sex higher education in the Northeast is duplicated in other States. I mention only my State of Virginia, where even today Hollins College, Mary Baldwin College, Randolph Macon Woman's College, and Sweet Briar College remain all women's colleges. Each has a proud and respected reputation of quality education.

[3] It is true that historically many institutions of higher education—particularly in the East and South—were single-sex. To these extents, choices were by no means universally available to all men and women. But choices always were substantial, and the purpose of relating the experience of our country with single-sex colleges and universities is to document what should be obvious: generations of Americans, including scholars, have thought—wholly without regard to any discriminatory animus—that there were distinct advantages in this type of higher education.

sen to be there, usually expressing a preference for the special benefits of single-sex institutions. Similar decisions were made by the colleges that elected to remain open to women only.[4]

The arguable benefits of single-sex colleges also continue to be recognized by students of higher education. The Carnegie Commission on Higher Education has reported that it "favor[s] the continuation of colleges for women. They provide an element of diversity . . . and [an environment in which women] generally . . . speak up more in their classes, . . . hold more positions of leadership on campus, . . . and . . . have more role models and mentors among women teachers and administrators." Carnegie Report, quoted in K. Davidson, R. Ginsburg, & H. Kay, Sex-Based Discrimination 814 (1975 ed.). A 10-year empirical study by the Cooperative Institutional Research Program of the American Counsel of Education and the University of California, Los Angeles, also has affirmed the distinctive benefits of single-sex colleges and universities. As summarized in A. Astin, Four Critical Years 232 (1977), the data established that

> "[b]oth [male and female] single-sex colleges facilitate student involvement in several areas: academic, interaction with faculty, and verbal aggressiveness. . . . Men's and women's colleges also have a positive effect on intellectual self-esteem. Students at single-sex colleges are more satisfied than students at coeducational col-

---

[4] In announcing Wellesley's decision in 1973 to remain a women's college, President Barbara Newell said that "[t]he research we have clearly demonstrates that women's colleges produce a disproportionate number of women leaders and women in responsible positions in society; it does demonstrate that the higher proportion of women on the faculty the higher the motivation for women students." Carnegie Report, in Babcock, at 1014. Similarly rejecting coeducation in 1971, the Mount Holyoke Trustees Committee on Coeducation reported that "the conditions that historically justified the founding of women's colleges" continued to justify their remaining in that tradition. *Ibid.*

leges with virtually all aspects of college life . . . . The only area where students are less satisfied is social life."[5]

Despite the continuing expressions that single-sex institutions may offer singular advantages to their students, there is no doubt that coeducational institutions are far more numerous. But their numerical predominance does not establish—in any sense properly cognizable by a court—that individual preferences for single-sex education are misguided or illegitimate, or that a State may not provide its citizens with a choice.[6]

## II

The issue in this case is whether a State transgresses the Constitution when—within the context of a public system that offers a diverse range of campuses, curricula, and educa-

---

[5] In this Court the benefits of single-sex education have been asserted by the students and alumnae of MUW. One would expect the Court to regard their views as directly relevant to this case:

"[I]n the aspect of life known as courtship or mate-pairing, the American female remains in the role of the pursued sex, expected to adorn and groom herself to attract the male. Without comment on the common sense or equities of this social arrangement, it remains a sociological fact.

"An institution of collegiate higher learning maintained exclusively for women is uniquely able to provide the education atmosphere in which some, but not all, women can best attain maximum learning potential. It can serve to overcome the historic repression of the past and can orient a woman to function and achieve in the still male dominated economy. It can free its students of the burden of playing the mating game while attending classes, thus giving academic rather than sexual emphasis. Consequently, many such institutions flourish and their graduates make significant contributions to the arts, professions and business." Brief for Mississippi University for Women Alumnae Association as *Amicus Curiae* 2-3.

[6] "[T]he Constitution does not require that a classification keep abreast of the latest in educational opinion, especially when there remains a respectable opinion to the contrary . . . . Any other rule would mean that courts and not legislatures would determine all matters of public policy." *Williams* v. *McNair*, 316 F. Supp. 134, 137 (SC 1970) (footnote omitted), summarily aff'd, 401 U. S. 951 (1971).

tional alternatives—it seeks to accommodate the legitimate personal preferences of those desiring the advantages of an all-women's college. In my view, the Court errs seriously by assuming—without argument or discussion—that the equal protection standard generally applicable to sex discrimination is appropriate here. That standard was designed to free women from "archaic and overbroad generalizations . . . ." *Schlesinger* v. *Ballard*, 419 U. S. 498, 508 (1975). In no previous case have we applied it to invalidate state efforts to *expand* women's choices. Nor are there prior sex discrimination decisions by this Court in which a male plaintiff, as in this case, had the choice of an equal benefit.

The cases cited by the Court therefore do not control the issue now before us. In most of them women were given no opportunity for the same benefit as men.[7] Cases involving male plaintiffs are equally inapplicable. In *Craig* v. *Boren*, 429 U. S. 190 (1976), a male under 21 was not permitted to buy beer anywhere in the State, and women were afforded no choice as to whether they would accept the "statistically measured but loose-fitting generalities concerning the drinking

---

[7] See *Kirchberg* v. *Feenstra*, 450 U. S. 455, 456 (1981) (invalidating statute "that gave husband, as 'head and master' of property jointly owned with his wife, the unilateral right to dispose of such property without his spouse's consent"); *Wengler* v. *Druggists Mutual Ins. Co.*, 446 U. S. 142, 147 (1980) (invalidating law under which the benefits "that the working woman can expect to be paid to her spouse in the case of her work-related death are less than those payable to the spouse of the deceased male wage earner"); *Stanton* v. *Stanton*, 421 U. S. 7 (1975) (invalidating statute that provided a shorter period of parental support obligation for female children than for male children); *Weinberger* v. *Wiesenfeld*, 420 U. S. 636, 645 (1975) (invalidating statute that failed to grant a woman worker "the same protection which a similarly situated male worker would have received"); *Frontiero* v. *Richardson*, 411 U. S. 677, 683 (1973) (invalidating statute containing a "mandatory preference for male applicants"); *Reed* v. *Reed*, 404 U. S. 71, 74 (1971) (invalidating an "arbitrary preference established in favor of males" in the administration of decedent's estates).

tendencies of aggregate groups." *Id.*, at 209. A similar situation prevailed in *Orr* v. *Orr*, 440 U. S. 268, 279 (1979), where men had no opportunity to seek alimony from their divorced wives, and women had no escape from the statute's stereotypical announcement of "the State's preference for an allocation of family responsibilities under which the wife plays a dependent role . . . ."[8]

By applying heightened equal protection analysis to this case,[9] the Court frustrates the liberating spirit of the Equal Protection Clause. It prohibits the States from providing women with an opportunity to choose the type of university they prefer. And yet it is these women whom the Court regards as the *victims* of an illegal, stereotyped perception of the role of women in our society. The Court reasons this way in a case in which no woman has complained, and the only complainant is a man who advances no claims on behalf of anyone else. His claim, it should be recalled, is not that he is being denied a substantive educational opportunity, or even the right to attend an all-male or a coeducational col-

---

[8] See also *Caban* v. *Mohammed*, 441 U. S. 380 (1979) (invalidating law that both denied men the opportunity—given to women—of blocking the adoption of his illegitimate child by means of withholding his consent, and did not permit men to counter the statute's generalization that the maternal role is more important to women than the paternal role is to men).

[9] Even the Court does not argue that the appropriate standard here is "strict scrutiny"—a standard that none of our "sex discrimination" cases ever has adopted. Sexual segregation in education differs from the tradition, typified by the decision in *Plessy* v. *Ferguson*, 163 U. S. 537 (1896), of "separate but equal" *racial* segregation. It was characteristic of racial segregation that segregated facilities were offered, not as alternatives to increase the choices available to blacks, but as the *sole* alternative. MUW stands in sharp contrast. Of Mississippi's 8 public universities and 16 public junior colleges, only MUW considers sex as a criterion for admission. Women consequently are free to select a coeducational education environment for themselves if they so desire; their attendance at MUW is not a matter of coercion.

lege.    See Brief for Respondent 24.[10]    It is *only* that the colleges open to him are located at inconvenient distances.[11]

## III

The Court views this case as presenting a serious equal protection claim of sex discrimination.    I do not, and I would sustain Mississippi's right to continue MUW on a rational-basis analysis.    But I need not apply this "lowest tier" of scrutiny.    I can accept for present purposes the standard applied by the Court: that there is a gender-based distinction that must serve an important governmental objective by means that are substantially related to its achievement. *E. g., Wengler* v. *Druggists Mutual Ins. Co.*, 446 U. S. 142, 150 (1980).    The record in this case reflects that MUW has a historic position in the State's educational system dating back to 1884.    More than 2,000 women presently evidence their preference for MUW by having enrolled there.    The choice is

---

[10] The Court says that "any gender-based classification provides one class a benefit or choice not available to the other class . . . ." *Ante*, at 731, n. 17.    It then states that the issue "is not whether the benefited class profits from the classification, but whether the State's decision to confer a benefit *only* upon *one* class by means of a discriminatory classification is substantially related to achieving a legitimate and substantial goal." *Ibid.* (emphasis added).    This is *not* the issue in this case.    Hogan is not complaining about any benefit conferred upon women.    Nor is he claiming discrimination because Mississippi offers no all-male college.    As his brief states: "Joe Hogan does not ask to attend an all-male college which offers a Bachelor of Science in Nursing; he asks only to attend MUW." Brief for Respondent 24.    And he asks this only for his personal convenience.

[11] Students in respondent's position, in "being denied the right to attend the State college in their home town, are treated no differently than are other students who reside in communities many miles distant from any State supported college or university.    The location of any such institution must necessarily inure to the benefit of some and to the detriment of others, depending upon the distance the affected individuals reside from the institution." *Heaton* v. *Bristol*, 317 S. W. 2d 86, 99 (Tex. Civ. App. 1958), cert. denied, 359 U. S. 230 (1959), quoted in *Williams* v. *McNair*, 316 F. Supp., at 137.

one that discriminates invidiously against no one.[12]  And the State's purpose in preserving that choice is legitimate and substantial.  Generations of our finest minds, both among educators and students, have believed that single-sex, college-level institutions afford distinctive benefits.  There are many persons, of course, who have different views.  But simply because there are these differences is no reason—certainly none of constitutional dimension—to conclude that no substantial state interest is served when such a choice is made available.

In arguing to the contrary, the Court suggests that the MUW is so operated as to "perpetuate the stereotyped view of nursing as an exclusively women's job."  *Ante,* at 729.  But as the Court itself acknowledges, *ante,* at 720, MUW's School of Nursing was not created until 1971—about 90 years after the single-sex campus itself was founded.  This hardly supports a link between nursing as a woman's profession and MUW's single-sex admission policy.  Indeed, MUW's School of Nursing was not instituted until more than a decade *after* a separate School of Nursing was established at the coeducational University of Mississippi at Jackson.  See University of Mississippi, 1982 Undergraduate Catalog 162.  The School of Nursing makes up only one part—a relatively small part[13]—of MUW's diverse modern university campus and curriculum.  The other departments on the MUW campus offer a typical range of degrees[14] and a typical range of sub-

---

[12] " 'Such a plan (i. e., giving the student a choice of a "single-sex" and coeducational institutions) exalts neither sex at the expense of the other, but to the contrary recognizes the equal rights of both sexes to the benefit of the best, most varied system of higher education that the State can supply.' "  *Williams* v. *McNair, supra,* at 138, n. 15, quoting *Heaton* v. *Bristol, supra,* at 100.

[13] For instance, the School of Nursing takes up 15 pages of MUW's 234-page course catalog.  See Mississippi University for Women, 81/82 Bulletin 185–200.

[14] *E. g.,* Bachelor of Arts; Bachelor of Science; Master of Arts; Master of Science.  See *id.,* at 40.  MUW also offers special preprofessional pro-

jects.[15]    There is no indication that women suffer fewer opportunities at other Mississippi state campuses because of MUW's admission policy.[16]

In sum, the practice of voluntarily chosen single-sex education is an honored tradition in our country, even if it now rarely exists in state colleges and universities.   Mississippi's accommodation of such student choices is legitimate because it is completely consensual and is important because it permits students to decide for themselves the type of college education they think will benefit them most.    Finally, Mississippi's policy is substantially related to its long-respected objective.[17]

---

grams in law, dentistry, medicine, pharmacy, physical therapy, and veterinary medicine.    *Ibid.*

[15] MUW's Bulletin in its Table of Contents lists the following subjects (offered in its School of Arts and Sciences): Air Force ROTC; Art; Behavioral Sciences; Biological Sciences; Business and Economics; Cooperative Education; English and Foreign Languages; Health, Physical Education, Recreation, and Dance; History, Journalism and Broadcasting; Mathematics; Music; Physical Sciences; and Speech Communication.    See *id.*, at 3.

[16] For instance, the catalog for the coeducational University of Mississippi lists in its general description the "Sarah Isom Center for Women's Studies," which is described as "dedicated to the development of curriculum and scholarship about women, the dissemination of information about their expanding career opportunities, and the establishment of mutual support networks for women of all ages and backgrounds."    University of Mississippi, 1982 Undergraduate Catalog 13–14.    This listing precedes information about the University's Law and Medical Centers.    *Id.*, at 14–15.

[17] The Court argues that MUW's means are not sufficiently related to its goal because it has allowed men to audit classes.    The extent of record information is that men have audited 138 courses in the last 10 years.    Brief for Respondent 21.    On average, then, men have audited 14 courses a year.    MUW's current annual catalog lists 913 courses offered in *one* year.    See Mississippi University for Women, 81/82 Bulletin *passim.*

It is understandable that MUW might believe that it could allow men to audit courses without materially affecting its environment.    MUW charges tuition but gives no academic credit for auditing.    The University evidently is correct in believing that few men will choose to audit under such circumstances.    This deviation from a perfect relationship between means and ends is insubstantial.

## IV

A distinctive feature of America's tradition has been respect for diversity. This has been characteristic of the peoples from numerous lands who have built our country. It is the essence of our democratic system. At stake in this case as I see it is the preservation of a small aspect of this diversity. But that aspect is by no means insignificant, given our heritage of available choice between single-sex and coeducational institutions of higher learning. The Court answers that there is discrimination—not just that which may be tolerable, as for example between those candidates for admission able to contribute most to an educational institution and those able to contribute less—but discrimination of constitutional dimension. But, having found "discrimination," the Court finds it difficult to identify the victims. It hardly can claim that women are discriminated against. A constitutional case is held to exist solely because one man found it inconvenient to travel to any of the other institutions made available to him by the State of Mississippi. In essence he insists that he has a right to attend a college in his home community. This simply is not a sex discrimination case. The Equal Protection Clause was never intended to be applied to this kind of case.[18]

---

[18] The Court, in the opening and closing sentences and note 7 of its opinion, states the issue in terms only of a "professional nursing school" and "decline[s] to address the question of whether MUW's admissions policy, as applied to males seeking admission to schools other than the School of Nursing, violates the Fourteenth Amendment." This would be a welcome limitation if, in fact, it leaves MUW free to remain an all-women's university in each of its other schools and departments—which include four schools and more than a dozen departments. Cf. nn. 13–15, *supra*. The question the Court does not answer is whether MUW may remain a women's university in every respect except its School of Nursing. This is a critical question for this University and its responsible board and officials. The Court holds today that they have deprived Hogan of constitutional rights because MUW is adjudged guilty of sex discrimination. The logic of the Court's entire opinion, apart from its statements mentioned above, appears to apply sweepingly to the entire University. The exclusion of men

from the School of Nursing is repeatedly characterized as "gender-based discrimination," subject to the same standard of analysis applied in previous sex discrimination cases of this Court. Nor does the opinion anywhere deny that this analysis applies to the entire University.

The Court nevertheless purports to decide this case "narrow[ly]." Normally and properly we decide only the question presented. It seems to me that in fact the issue properly before us is the single-sex policy of the University, and it is this issue that I have addressed in this dissent. The Court of Appeals so viewed this case, and unambiguously held that a single-sex state institution of higher education no longer is permitted by the Constitution. I see no principled way—in light of the Court's rationale—to reach a different result with respect to other MUW schools and departments. But given the Court's insistence that its decision applies only to the School of Nursing, it is my view that the Board and officials of MUW may continue to operate the remainder of the University on a single-sex basis without fear of personal liability. The standard of such liability is whether the conduct of the official "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982). The Court today leaves in doubt the reach of its decision.