Justice PARRISH,
dissenting:
I 148 I agree with Justice Nehring that the affidavit requirement of the Utah Adoption Act (the Act), Utah Code section 78B-6-121(8)(b), unconstitutionally discriminates against unwed fathers on the basis of their gender. But I find the tenor of his dissent regrettable. In my view, the constitutional validity of the affidavit requirement presents a close issue on which reasonable minds can legitimately disagree. I therefore write separately on the narrow issue of equal protection. I would strike the affidavit requirement as violative of the Equal Protection Clause of the United States Constitution. As a result, I would not address Mr. Bolden's claim that the affidavit requirement violates his right to due process or the uniform operation of-laws.
T144 As both the majority opinion and Justice Nehring's dissent explain, the affidavit requirement discriminates on the basis of sex.[1] In order for an unwed father to per-feet his parental rights, he must file[ ] with the court ... a sworn affidavit:
() stating that he is fully able and willing to have full custody of the child;
(M) setting forth his plans for care of the child; and
(i) agreeing to a court order of child support and the payment of expenses incurred in connection with the mother's pregnancy and the child's birth.[2]
An unwed mother is not required to file a similar affidavit; her parental rights are perfected by default.
1 145 This is facially disparate treatment on the basis of sex. Accordingly, to pass muster under the Equal Protection Clause of the United States Constitution,[3] the affidavit requirement must withstand intermediate serutiny.[4] To satisfy this standard, the proponent of the requirement, in this case the Does, must demonstrate that the disparate treatment of an unwed mother and an unwed father is "substantially related" to achieving an important governmental objective.[5] Phrased another way, "[t]he fit between the means and the important end [must bel 'exceedingly persuasive'"[6] In my view, the Does have not satisfied their burden.
I. INTERMEDIATE SCRUTINY
1146 The majority correctly recognizes that legislative classifications that discriminate on the basis of gender are evaluated under a standard of intermediate serutiny. In my view, however, the majority unfairly distinguishes controlling precedent from the United States Supreme Court by implying that there are actually two categories of intermediate scrutiny and then evaluating the affidavit requirement under the less stringent standard.
T 147 The majority would apply a higher level of serutiny to those cases of " 'official *1057 action that close[ ] a door or den[y] opportunity to women (or men)" [7] In cases of this nature, the majority says that the standard is "difficult" to satisfy because it requires "an 'exceedingly persuasive' justification." [8] The majority says the standard is "easier to satisfy" in all other "less imposing" cases of discrimination on the basis of sex.[9] | In particular, when "differential treatment of men and women stems initially ... from a straightforward matter of biology," the majority would require only a "substantial fit" between the legislative objective and the discriminatory means at issue.[10]
T148 But the United States Supreme Court has not recognized the distinction suggested by the majority. It has articulated only one definition of intermediate scrutiny applicable in sex discrimination cases. In fact, it has defined an "exceedingly persuasive justification" as one in which the discriminatory scheme is "substantially related" to the ends it seeks to achieve.[11] I therefore am not persuaded that the United States Supreme Court cases striking sex-based classifications for failure to advance an exceedingly persuasive justification are distinguishable.[12] And while I acknowledge that the United States Supreme Court's precedent in this area is far from clear, it appears to me that the majority opinion's formulation of the lower level of intermediate serutiny it applies is, in practice, virtually indistinguishable from the rational basis review applicable in cases that involve no discriminatory classification. f
IL THE DOES HAVE FAILED TO MEET THEIR BURDEN OF ESTABLISHING AN EXCEEDINGLY PERSUASIVE JUSTIFICATION FOR THE DISCRIMINATORY AFFIDAVIT REQUIREMENT
149 In my view, application of the established standard of intermediate serutiny to the affidavit requirement leads to the conclusion that the Does have failed to meet their burden of establishing that the Act's disparate treatment of unwed fathers and unwed mothers is substantially related to achieving an important governmental objective. The starting point of the analysis is to identify the objectives that the Act is intended to promote.
1150 The Act 'sets forth a variety of governmental objectives. -It declares that "[It is the intent and desire of the Legislature that in every adoption the best interest of the child should govern." [13] The Act further declares that "the state has a compelling interest in requiring unmarried biological fathers to demonstrate commitment" to the responsibilities of parenthood.[14] While the Legislature may prefer that we simply accept what is set out in the "Legislative intent and findings" section of the Act,[15] intermediate seru-tiny requires a more searching analysis. This is particularly true in cases such as this, where one of the stated legislative objectives is itself discriminatory-that of requiring that only unmarried biological fathers demonstrate commitment to the responsibilities of parenthood. Therefore, while the Legislature has defined the purpose of the Act as requiring only unmarried biological fathers *1058 to demonstrate commitment to parenthood, we must ask why it has no similar objective with regard to unmarried biological mothers. And while the Act purports to further the broad objective of advancing the best interest of the child, we must confront why only biological fathers-and not biological mothers-must express a future commitment to accept full custody of their biological child before they may have any say in the child's future.[16]
1 151 Because we cannot allow a discriminatory legislative objective to justify a discriminatory legislative requirement, we must conclude that the Act's objective is to secure a forward-looking commitment by a parent to raise a child before allowing that parent to have any say in the child's future. And if that is the objective, we must ask why such a forward-looking commitment is required of only unwed fathers.
[152 The majority maintains that the Act serves two purposes. First, the majority posits. that it provides a mechanism . of promptly identifying those who might be designated as parents.[17] Second, it ensures that such persons will fulfill their parental role.[18] I acknowledge that biological differences between men and women justify their disparate treatment with respect to the identification of unwed fathers. But I fail to see how such biological differences justify treating men and women differently when it comes to their forward-looking commitment to fulfill their parental role. Because the affidavit requirement relates only to this second objective, I conclude that it fails intermediate serutiny.
1153 The starting point for analyzing the Act's disparate treatment of men and women is the legitimate difference between a mother's and a father's biology, A mother's biological relationship with her child is readily apparent; a father's is not. Because of this biological fact, I believe it is entirely legitimate for the Act to provide a mechanism for prompt and reliable identification of a child's biological father. The Act accomplishes this by requiring an unwed biological father to "initiate[ ] proceedings in a district court of Utah to establish paternity" and to "file[ ] notice of the commencement of paternity proceedings ... with the state registrar of vital statistics.[19] And because the biological mother's identity is obvious, while a biological father's is not, the Act's limitation of these requirements to biological fathers has an exceedingly persuasive fit with the statutory objective of parental identification.
Similarly, a, mother's biology requires her to shoulder responsibility for the expenses of pregnancy and child birth; a father's biology does not. Based on this legitimate biological difference, the Act provides a mechanism that is substantially related to achieving the important governmental objective of requiring each parent to pay "a fair and reasonable amount of expenses ... in accordance with his [or her] financial ability."[20] The Act accomplishes this by requiring unwed biological fathers to pay a fair share of such expenses. Again, I find that this requirement is justified by legitimate ~biological differences and is substantially related to the legislative objective that parents share the financial burden of bringing a child into the world.[21]
*1059 (155 But onee a child is born and his or her parents are identified, I do not believe that biological differences between men and women justify disparate treatment of unwed mothers and unwed fathers. The majority posits that a mother's biology allows her to show a commitment to a child by carrying the child to term.[22] And because a father's biology allows no similar biological manifestation of commitment, the majority accepts: the affidavit requirement as a "defensible ... attempt to put unwed parents on equal footing." [23] Assuming that the legislative objective is to put unwed parents on equal footing, I do not believe that the affidavit requirement substantially advances that objective. Indeed, the affidavit requirement demands a commitment from unwed fathers that goes far beyond what a mother's biology necessarily implies about her forward-looking commitment to raise her child.[24] While a father is required to swear "that he is fully able and willing to have full custody of the child," to "set[ ] forth his plans for care of the child," and to "agree[] to a court order of child support and the payment of [pregnancy and child birth] expenses," no such commitment is required of unwed mothers.[25] In my view, the affidavit requirement provides something less than an exceedingly persuasive fit with the biological differences of commitment ex; pressed through the gestation and birthing process.
{156 By carrying her child to term, an unwed mother demonstrates some level of commitment. But that commitment cannot necessarily be interpreted as a forward-looking commitment to raise her child. Indeed, because the affidavit requirement is found in the Utah Adoption Act, it will only be implicated when a biological mother has no commitment to "have full custody of the child," to develop "plans for care of the child," or to "agree[ ] to a court order 'of child support and payment of [pregnancy and birth] expenses." [26] So while a mother without any forward-looking. commitment to her child has standing, a father with an identical level of commitment does not. ©
157 In my view, the fit between the Act's objective of securing a specific, forward-looking commitment to raise a child and the affidavit requirement is simply too imprecise to justify the disparate treatment of unmarried biological mothers and unmarried biological fathers. While biology may demonstrate a biological mother's commitment to bring a child into the world, it does not necessarily demonstrate a commitment to raise her child. But the Act requires that an unwed biological father unequivocally express his forward-looking commitment to raise his child, In my view, such a disparate advancement of the State's stated objective in securing parental commitment is not a close enough fit to withstand intermediate scrutiny. «
CONCLUSION
1158 Because the affidavit requirement of the Utah Adoption Act results in the disparate treatment of unwed fathers and unwed *1060 mothers, the Does have the burden of showing that the requirement satisfies intermediate serutiny. In other words, they must establish that the affidavit requirement is substantially related to achieving an important governmental objective.[28] I do not believe that they have satisfied their burden. The affidavit requirement goes one step too far by requiring unwed fathers, but not unwed mothers, to make forward-looking commitments to child rearing. In so doing, the affidavit requirement tips the balance against the unwed father by requiring him to demonstrate more than the unwed mother demonstrates by the sheer fact of her biology. I would therefore hold that the affidavit requirement of the Utah Adoption Act, Utah Code section 78B-6-121(8)(b), violates the Equal Protection Clause of the United States Constitution.

. See supra 172; supra % 87.

. Urax Cone § 78B-6~121(3)(b).

. U.S. Constr amend. XIV, § 1.

. Nguyen v. LN.S., 533 U.S. 53, 60, 121 S.Ct. 2053, 150 L.Ed.2d 115 (2001).

. Id.

. Id. at 70, 121 S.Ct. 2053.

. Supra %70 (quoting United States v. Virginia, 518 U.S. 515, 532, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996)).

. Supra 170 (quoting Virginia, 518 U.S. at 532, 116 S.Ct. 2264).

. Supra 170.

. Supra 173.

. In Nguyen, Justice Kennedy, with Justices Rehnquist, Stevens, Scalia, and Thomas joining, - recognized a single standard for evaluating claims of sex discrimination under the Equal Protection Clause, "explain[ing] that an 'exceedingly persuasive justification' is established 'by showing at least that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" 533 U.S. at 70, 121 S.Ct. 2053 (quoting Miss. Univ. for Women v. Hogan, 458 U.S. 718, 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982) (internal quotation marks omitted)).

. See, eg., Virginia, 518 U.S. at 523-24, 116 S.Ct. 2264; Hogan, 458 U.S. at 724, 102 S.Ct. 3331.

. Urax Cose § 78B-6-102(1).

. Id. § 78B-6-102(5)(B.

. Seeid. § 78B-6-102.

. In practice, the Act defines the best interest of the child as a commitment by the biological father to "have full custody," to develop "plans for care," and to "agree[] to a court order of child support and payment of [pregnancy and birth] expenses." Id. § 78B-6-121(3)(b). And this forward-looking commitment is required before an unwed father can have any say regarding the future of his child, whether he intends to consent to a proposed adoption, consent to adoption by others of his choosing, place the child with a close family member, or raise the child himself. No such forward-looking commitment is required on the part of an unwed biological mother.

. Supra ¶75.

. Supra ¶75.

. Ura § 78B-6-121(3)(a), (c).

. Id. § 78B-6-121(3)(d).

. There may be some concern that an unwed mother will, as a result of her biological position as a mother, be forced to raise an unwanted child and be burdened with post-birth expenses if the biological father is allowed to refuse consent to adoption but nevertheless does not take custody of the child or fulfill his financial responsibility. But Utah law provides a mechanism pursuant to which a biological mother can safely relinquish her parental rights and responsibilities . apart from adoption. Urau Copr §§ 62A-4a-802, 78A~6-504, «514.

. Supra %78.

. Supra 79-80.

. The plain language of the Act supports this conclusion. Indeed, in the same section of the Act that asserts the State's compelling interest in requiring unwed fathers to demonstrate their commitment to the responsibilities of parenthood, the Act explains that an unwed father "demonstrate[s] [his] commitment by providing appropriate medical care and financial support and by establishing legal paternity." Urax Cope § 78B-6-102(5)(M). By fulfilling subsections (3)(a) and (3)(c) (the paternity requirements) and (3)(d) (the payment-of-pregnancy-expenses requirement) of section 78B-6-121, an unwed father has satisfied the State's mandate that he demonstrate his commitment to the responsibilities of parenthood. The affidavit requirement is therefore beyond what the Legislature itself has stated is necessary for an unwed father to demonstrate his commitment.

. Id. § 78B-6-121(3)(b).

. Id. Further, the Legislature has recognized that some mothers have no commitment to raise a child and has, therefore, provided two mechanisms whereby a mother may relinquish her parental rights and responsibilities A mother "may safely relinquish a newborn child at a hospital ... and retain complete anonymity" without fear of investigation or prosecution. Id. § 62A-4a-802. Alternatively, she may voluntarily relinquish or consent to termination of her parental rights so long as a court finds that it is in the "child's best interest." Id. §§ 78A-6-504, -514. ~

. Nguyen v. I.N.S., 533 U.S. 53, 60, 121 S.Ct.