OPINION OF THE COURT
John Manning Regan, J.
FACTS
On Saturday, June 24, 1989, these nine defendants, all of *116 whom are women, were picnicking at Durand-Eastman Beach, and its adjacent park areas. Durand-Eastman is a public park and beach located in the City of Rochester, on the south shore of Lake Ontario. It is a large park, containing a golf course, many grassy playing fields, and acres of quiet woodlands. The beach itself is quite wide and open, and extends for more than a mile in length. On hot summer days, Durand-Eastman is a highly popular place for swimming, and all kinds of outdoor activities. It is a particular favorite for families.
June 24, 1989 was a hot summer day. During the early afternoon, as the temperature rose into the high 80’s, the defendants removed all their clothing from above their waists, and remained in the public park areas so exposed. Some were swimming and sunbathing, some were playing volleyball, and some were eating lunch.
A Sheriff’s patrol boat, stationed on the lake near the beach area, was the first to receive a radio broadcast over a marine frequency that naked people were occupying the beach area. Deputy Zink responded to this broadcast in two ways: first, by mooring his boat and going to the beach, and second, by transmitting radio messages to Sheriff’s patrol cars assigned to the park, alerting them to the situation, and requesting their assistance.
When Zink arrived at the scene where the defendants were, he saw about 25 to 30 women naked from above the waist. Because he was aware that New York’s penal laws forbade public exposure of a female person’s breasts below the top of the areola,[1] he admonished all the women to cover their breasts. Many of the women complied. These defendants did not comply. Zink repeated his orders several times, but these *117 defendants disobeyed him. As these events were in progress, the patrol cars Zink had summoned arrived. Unable by any method to convince any of these defendants that they should cover their breasts, Zink authorized their arrests for violation of Penal Law § 245.01.
Accordingly, the defendants were arrested, put in a transport van, and taken downtown to police headquarters for identification, fingerprinting, and booking on that charge. After an hour or so, they were released with appearance tickets for arraignment on Tuesday, June 27th, in court.
On June 27th, all the defendants pleaded not guilty. After preliminary matters were completed, the court scheduled this trial for September 26th. The trial concluded on October 2, 1989.
The trial did not produce any controversy over questions of fact. The defendants, as well as the witnesses for the prosecution, testified similarly. All the witnesses agreed that, at the public park on that day in June, all of these defendants had deliberately exposed their breasts, and when they were advised to cover them, they had refused to do so.
What did develop at the trial was a concerted effort to persuade this court that Penal Law § 245.01 is an unconstitutional attempt to deprive these defendants of equal protection of the law. The defendants have argued that exposure of the breast is a penal violation only for women, not for men. They have urged that this gender classification is discriminatory and unjustified. They have produced experts in psychology, and other social sciences, to show that this law rests on sexual stereotypes, not on scientific findings, and that it has no rational basis. Moreover, through other social science data, they have striven to show that the law is actually harmful to women and fails to achieve any important governmental objective.
These defendants are sincere in their legal arguments. They have consciously narrowed the evidence and this court’s focus, to such an extent that the sole question for decision in this case is whether this penal statute violates the guarantee of equal protection of the law, which the Constitution grants to all persons. That was the only motion the defendants made at the close of the proofs — to dismiss the charges on these constitutional grounds.
DECISION AND VERDICT
For the reasons which follow, this court denies the motion *118 to dismiss these charges on the ground that the penal statute prohibiting women from publicly exposing their breasts is an unconstitutional deprivation of equal protection of the law. Moreover, upon all the credible evidence, the court finds each defendant guilty of violating section 245.01 of the Penal Law of New York.
OPINION
This court agrees with the defendants that this statute discriminates on a purely sexual basis. It commands women to cover their breasts in public. It issues no similar command to men.
However, under the law, such sexual discriminations do not constitute a denial of equal protection of the law so long as the discrimination is "substantially related to the achievement of” an "important governmental objective”. (See, Mississippi Univ. for Women v Hogan, 458 US 718, 724 [1982] [emphasis added]; People v Liberta, 64 NY2d 152 [1984]; People v Craft, 134 Misc 2d 121 [1986].)
The question then is whether the law banning public exposure of woman’s breasts is substantially related to the achievement of an important governmental objective. Since this court has concluded that it is so related, no constitutional deprivation exists.
A. HISTORY OF THE STATUTE
In 1967, in order to counter the proliferation of topless waitresses in the bars and taverns of New York City, the Legislature enacted a proposed bill from the office of the Corporation Counsel of the City of New York which prohibited women from appearing in public places nude from above the waist. This original law was entitled: "Exposure of a female”, and modified what was then section 1140 of the Penal Law and section 245.01 of the revised Penal Law.[2]
The impetus behind passage of this bill was to prevent public indecency.[3] It exempted women who exposed their breasts while performing in a theatrical setting. It also punished anyone from promoting such public exposure of females —thereby targeting the bar and tavern owners themselves.
*119 In 1983, the Legislature considered, and passed, a totally revised version of the indecent exposure laws. Insofar as possible, it made the statute gender-neutral, i.e., applicable to both men and women, and banned public nudity by persons of either sex. But the new statute retained the sexually based discrimination in respect to breasts, and continued, in the very same language, to forbid only women from exposing their breasts in public.[4]
These revisions of 1983 are the current law, except for the additional exemption of 1984, which exonerated women engaged in the breast-feeding of infants.[5]
The 1983 revisions, however, were even more parochial in origins than the topless waitress fad of 1967. As the legislative history demonstrates, the new statute sought to correct a situation which had developed at Jacob Riis Beach in Queens in which nude bathers, both male and female, had so monopolized the beach area as to exclude the residents of the local community. As Governor Cuomo stated when he approved the law: "I am aware that there are parents and children who use public beaches as their major summer recreational experience. This law will protect them from the discomfort caused by unwelcome public nudity.”[6]
What is distilled from this legislative history are four indisputable points:
1. The law proscribes public nudity as such, regardless of any ulterior state of mind, or lewdness of purpose.
2. The law defines nudity as the exposure of the private and intimate parts of the human body, and declares the breasts of a female, but not of a male, as a private or intimate part of the human body.
3. The law penalizes nudity, not a manner of dress nor a form of personal appearance.
4. The purpose of the law is to protect public decency, and to prohibit public indecency.
B. THE ACHIEVEMENT OF PUBLIC DECENCY IS AN IMPORTANT GOVERNMENTAL OBJECTIVE
In Webster’s Encyclopedic Dictionary the word decency is *120 defined as a state or quality which gains general approval. It is attributable to dress, behavior, speech, ritual, and all other forms of human conduct.[7]
Since it is a fundamental objective of the criminal law to establish a minimum standard of decent behavior, criminal statutes which decide what conduct society shall not tolerate necessarily attempt to determine what human behavior will, and what will not, gain general public approval or disapproval, as the case may be. The task is not always easy.
In this case, the Legislature has decided that public exposure of the female breasts — absent certain exceptions — is behavior which will not attain general approval, and which the general public will overwhelmingly disapprove for the foreseeable future.
The defendants argue that the Legislature is wrong, and that exposure of the female breasts is both decent and wholesome.
One short answer to this argument is that the defendants should take the matter up with the Legislature, not the courts.
A more appropriate answer — in view of the obvious good faith of these defendants — is that coping with public nudity, and fixing a point of limitation on it, is essential to maintaining public morality and decency. Arid establishing public morality and decency is critical to the sense of identity and self-worth of any society, because those virtues promote order, self-discipline, and tranquility. That is what makes public decency an important governmental concern.
There is no question that — historically at least — the United States is a society which accepts Judeo-Christian teachings. While we are pluralistic in composition, the great majority of our people observe Judeo-Christian moral standards. If lawmakers refer to those standards for guidance in enacting laws to achieve public morality, therefore, they will, more likely than not, accomplish their purpose.
Nudity and morality are inextricably interwoven in the Judeo-Christian ethic. The first book of the Bible — Genesis— uses nudity, and man’s consciousness of it, to illustrate how mankind acquired the knowledge of good and evil.
"So she took some of its fruit and ate it; and she also gave some to her husband, who was with her, and he ate it.
*121 "7. Then the eyes of both of them were opened, and they realized that they were naked, so they sewed fig leaves together and made loin cloths for themselves.
"8. When they heard the sound of the Lord God moving about in the garden at the breezy time of the day, the man and his wife hid themselves from the Lord God among the trees of the garden.
"9. The Lord God then called to the man and asked him 'Where are you?’
"10. He answered; I heard you in the garden but I was afraid, because I was naked, so I hid myself.
"11. Then the Lord God asked: 'Who told you that you were naked?’ You have eaten then from the tree (of the knowledge of good and evil) of which I had forbidden you to eat!” (Genesis 3:6-11.)
Nudity, accordingly, in the Judeo-Christian ethic, is a catalyst for shame, and for immoral behavior. It triggers a compelling and immediate choice between good and evil for anyone who possesses the knowledge of good and evil. Judeo-Christian morality bans public nudity therefore to reduce the incidence of that choice and, correspondingly, to reduce the incidence of public misbehavior.
Genesis, and its allegorical moral teachings, have permeated the collective moral conscience of our civilization for thousands of years. Those moral principles have gained acceptance among the vast majority of western peoples, including those living in the United States. By contrast, this Nation is barely 200 years old, and the State Legislature, as we know it, a little more than 150 years old. What our Legislature has done, then, is to pass a law about public nudity which reflects the moral standards of public decency already prevalent in the society. In doing so, the Legislature contributes to the preservation of peace and order (which is one of the primary goals of police power statutes) by reducing the incidence of circumstances likely to create public disorder.[8]
C. THE CONSTITUTION DOES NOT GRANT TO ANY INDIVIDUAL A RIGHT TO PUBLIC NUDITY
Since Griswold v Connecticut (381 US 479 [1965]), funda *122 mental rights of privacy and liberty which individuals have claimed to "emanate” from the Constitution have expanded significantly. In 1986, Robert Hollman, who had appeared nude on Jacob Riis Beach in Queens, and who had been convicted of a violation of the present indecent exposure law (Penal Law § 245.01), tried to persuade thfe New York Court of Appeals that he held a fundamental constitutional right to appear nude in public. Hollman’s arguments to that court at the time are virtually identical to the defendants’ argument to this court now: to wit, that nudism promotes physical and psychological health, heightened awareness of human potentials, and freedom from the repressions of Puritanism and the constraints of clothing.
The Court of Appeals decided then, and accordingly, this court must decide now, that no such fundamental right exists; that public nudity is not an essential ingredient of constitutional liberty, and that, far from promoting and preserving the public order, it frequently causes a breach of the public peace, because it violates the predominant sense of moral decency which our society has already accepted.[9]
Therefore, the ruling in People v Hollman (68 NY2d 202 [1986]) obliges this court to deny the motion to dismiss the informations on that ground.
D. PUBLIC EXPOSURE OF THE FEMALE BREAST, BUT NOT THE MALE BREAST IS REASONABLY CLASSIFIED AS NUDITY OF A PRIVATE AND INTIMATE PART OF THE BODY
This court now comes to the most ardently contested issue in this case: i.e., that the law barring public exposure of women’s breasts, but not men’s breasts, based upon a finding that women’s breasts, but not men’s, constitute a private or intimate part of the human body, lacks a rational basis, and *123 for that reason, its sexual classification is constitutionally void.
In this regard, the testimony of the defendants’ expert witness, Dr. Rita Freedman, Ph.D., of Scarsdale, New York, is most illuminating. Dr. Freedman is a specialist in developmental psychology, concentrating on gender development. She distinguishes between primary and secondary sexual characteristics within the human body. But what is more, she noted the differences among those characteristics depending on whether the classification is physiological, or psychological. The physiological characteristics are those which permit and facilitate reproduction of the human species. The psychological characteristics are those which operate erotically to stimulate sexual activity.
Physiologically, the primary sexual organs do not include the breasts of either sex. Psychologically and erotically, however, the expert admitted that, in our current society, the female breast is, indeed, a primary sexual characteristic.
Although Dr. Freedman explained, at length, that these erotic properties of the female breast are essentially cultural, as distinguished from natural, and although she elaborated on the oscillation among cultures, from body part to body part, as to which part(s) possessed such properties, she nonetheless admitted that, in the United States today, now, and for the foreseeable future, the female breast possesses the erotic properties of a primary sexual organ, and the male breast does not.
The defendants argue that Puritanical laws (such as Penal Law § 245.01), requiring that the female breast be covered, have, in fact, caused the female breast to become invested with this erotic power, and that public exposure of female breasts would quickly remove this erotic characteristic. The argument is not persuasive. As the court stated in Eckl v Davis (51 Cal App 3d 831, 848, 124 Cal Rptr 685, 696 [1975]): "Nature, not the legislative body, created the distinction between that portion of a woman’s body and that of a man’s torso. Unlike the situation with respect to men, nudity in the case of women is commonly understood to include the uncovering of the breasts.”
Social organization is the mother of cultural mores. Social and cultural development antedate the foundation of political institutions. The acclivity of human progress tends towards rational order. Laws emerge at the upper levels of the graph *124 of human experience. And to be successful, those laws must reflect what has gone before, and what has already bound the community together.
This court finds that, understood from this perspective, Penal Law § 245.01 rests upon a rational basis, and reflects the current moral standards of New York, and creates a constitutionally valid classification between male and female nudity.
ORDER
The defendants shall appear, in person, at 9:30 a.m. before this court on Wednesday, December 13, 1989, for sentencing.

. See Penal Law § 245.01 which reads as follows:
"A person is guilty of exposure if he appears in a public place in such a manner that the private or intimate parts of his body are unclothed or exposed. For purposes of this section, the private or intimate parts of a female person shall include that portion of the breast which is below the top of the areola. This section shall not apply to the breastfeeding of infants or to any person entertaining or performing in a play, exhibition, show or entertainment.
"Exposure of a person is a violation.
"Nothing in this section shall prevent the adoption by a city, town or village of a local law prohibiting exposure of a person as herein defined in a public place, at any time, whether or not such person is entertaining or performing in a play, exhibition, show or entertainment.”
This law applies only to public nudity. Nudity in circumstances where there is a reasonable expectation of privacy is not within the scope of the statute.

. See, Laws of 1967 (ch 367).

. See, Legislative Report, NY State Bar Assn., Report No. 170, Apr. 18, 1967, from Bill Jacket No. S. 1226-B.

. See, Laws of 1983 (ch 216).

. See, Laws of 1984 (ch 633).

. Message of Governor, June 2,1983, upon approving the bill. (See, 1983 McKinney’s Session Laws of NY, at 2756.)

. See, Webster’s Encyclopedic Dictionary 220 (1971 ed).

. In People v Price (33 NY2d 831 [1973]) the Court of Appeals recognized the legitimacy of legislation regulating the manner of dress whenever it created circumstances risking public disorder.

. The court acknowledges here that, notwithstanding the disclaimers in the opinion of the Court of Appeals in the Hollman case (68 NY2d 202), the purpose of the indecent exposure law is not only to provide general public access to recreational areas, but it is also to set a standard of morally decent behavior. It is because public nudity is not morally decent and acceptable that families stayed away from Jacob Riis Beach. Reestablishment of the moral standards on public nudity, in effect, returned the beach to the general public, and specifically, to family use. Therefore, there is no question that the indecent exposure laws enact moral judgments which serve to benefit the common good. Law and morality are not so separate when the public order must be served. Moreover, it is clear that under the New York Constitution, an advocate of public nudism cannot be a law unto himself.