The **ASSOCIATED GENERAL CONTRACTORS OF CONNECTICUT, et al.**

v.

**CITY OF NEW HAVEN.**

**No. 3:89–cv–00303 (PCD).**

United States District Court, D. Connecticut.

May 4, 1992.

Michael N. LaVelle, Pullman, Comley, Bridgeport, Conn., for plaintiffs.

Craig S. Tascher, Tarlow, Levy, Harding & Droney, Farmington, Conn., for intervenor B.T. Contractors.

Aileen M. Bell, W. Martyn Philpot, Jr., Corp. Counsel, New Haven, Conn., for defendant.

Jonel Newman, Ct. Civ. Liberties, Hartford, Conn., James W. Henderson, Jr., National Ass'n of Minority Contractors of Connecticut, Bloomfield, Conn., amicus briefs.

## RULING ON MOTION FOR SUMMARY JUDGMENT

DORSEY, District Judge.

Plaintiffs seek a declaration that an ordinance which sets aside a percentage of city contracts for "disadvantaged and women business enterprises" is unconstitutional in light of *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). Pending is plaintiffs' motion for summary judgment.[1]

---

1. Defendant argues, in opposition, that plaintiffs lack standing to claim the ordinance is unconstitutional. By Ruling on Pending Motions, March 10, 1990, plaintiffs were held to have

Legislating attitudes is not readily accomplished. It flies in the face of the first amendment's right of choice of association and the constitutional concept of individual liberty. The right of the individual to make personal choices, the essence of liberty, when based on race, religion, ethnic background, or gender is discrimination. Many individual choices which reflect bias or prejudice are unquestionably beyond the reach of the government. Yet, when individuals' choices drastically impinge on the liberty of others, governmental intrusion on the freedom to make such choices is tolerated.

In this nation of so many religions, races, and ethnic origins, bias against groups and individuals within groups has been a constant social phenomenon. Thus, new groups entering the country have faced hostility until integration brought a degree of acceptance. The substantial degree of black subordination to an inferior status, which has continued, has prompted the enactment of corrective laws. Thus, the City of New Haven, not unlike many municipalities troubled by discriminatory conduct, with which the town may have passively participated, has sought to rectify perceived discrimination against minorities in the construction industry. Set-aside ordinances are intended to foster and encourage minorities to become established in that business with the hope and expectation that, by being forced to accept and do business with minority and women business enterprises ("MBEs" and "WBEs"), non-minority businesses will come to do so of their own volition.

The unquestionably well intentioned adoption of such laws incorporates race conscious criteria. So here, New Haven has a specific set-aside for women-owned companies and for businesses of the disadvantaged, within which minorities are presumed to be included. Use of race-conscious criteria contravenes the notion of equal protection. Thus, the ordinance in question, to the extent of the set aside, treats groups within the industry different-

ly. Minorities, the disadvantaged, and women are advantaged. Plaintiffs challenge the ordinance, though they are only being forced to seek out and employ subcontractors to fulfill the set asides. Their free choice of subcontractors, who would do no different work, nor at greater cost, in theory, is thus inhibited. Plaintiffs, therefore, claim its members' rights are violated by New Haven's effort to rectify on-going discrimination which denies equality of treatment to minorities and women.

*Facts and Procedural History*

From 1977 through 1989, a "set-aside" ordinance, known as Chapter 12½, was in effect. It reserved to MBEs and WBEs a percentage of the city's construction contracts. During this period, the share of such contracts received by MBEs and WBEs rose significantly. Between 1974 and 1979, minority and women-owned companies combined received less than 1% of public contracts. From 1983 to 1985, MBEs and WBEs, then approximately 10% of the construction companies, received approximately 10.6% of the contracts. In 1986, their share fell to 2%, but rose to 20% in 1987, and to almost 25% in 1988. Of 198 minority businesses in New Haven in 1988, 8%, or 16, were in construction. The average age of the minority businesses was 10.8 years. As of 1987, 6% of the New Haven construction firms were black-owned, .5% were hispanic-owned, and 3% were women-owned. This was unchanged over the prior four years. From 1983 to 1985, MBEs were awarded 7.5% of the city contract awards (by number) and WBEs firms were awarded 3%. In dollar terms, MBEs received 7% and WBEs 3%. These are slightly below the set-aside in Chapter 12¼ and not inconsistent, according to Dr. Jaynes, with contractors' complaints of unavailability of MBEs and WBEs to do the work at reasonable prices. Report of Dr. Jaynes at 45. In 1986, women and minorities received a combined 2% of such contracts. In 1987, WBEs reportedly received 20%. In 1988, of $110,000,000 in

standing. As there is no argument for a contrary result with respect to the Chapter 12¼, the

prior ruling shall stand.

city contracts, MBEs received 24% and WBEs 25%. No information was provided as to the location of the subcontractors.

In 1989, the city conducted studies of racism within the city's construction industry. It was determined that a need for a set-aside ordinance continued and, thus, it adopted Chapter 12¼. Plaintiffs claim that Chapter 12¼ is virtually identical to Chapter 12½ and that it is facially invalid.

*Discussion*

A. *Standard of Review*

■ Summary judgment requires a determination as to whether a genuine issue of material fact exists. The standard of review is detailed in *Cote v. Durham Life Ins. Co.*, 754 F.Supp. 18, 19 (D.Conn.1991). Defendant contends that questions of fact are disputed. That view assumes that whether the evidence before the Board of Aldermen justified its conclusion that a compelling interest was presented was a question of fact. It is not; it is a question of law.

■ The standard of review of challenges to a statute which employs a suspect classification, such as race, is "strict scrutiny." Such a statute will only be upheld if there is a "compelling state interest" in enacting the law and if the law is "narrowly" tailored to achieve that interest. *See, e.g., Croson*, 488 U.S. at 494, 109 S.Ct. at 721; *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). Where gender is involved, the statute must serve "an important government objective" and the methods must be substantially related to the achievement of that objective. *See, e.g., Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648, 95 S.Ct. 1225, 1233, 43 L.Ed.2d 514 (1975). Intermediate scrutiny is the standard. *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

B. *Chapter 12¼*

Chapter 12¼–5.l. provides that

on all City Construction Contracts and Development Agreements ... where the costs of construction exceed $75,000, the Construction Contractor or the Developer ... shall make maximum practicable efforts to insure that 4% of the construction costs shall be set aside for subcontractors, which are certified as women business enterprises and that 10% of the construction costs shall be set aside for subcontractors, which are certified as disadvantaged business enterprises....

A "disadvantaged enterprise" is controlled by one or more "disadvantaged individuals," who are defined as:

(a) individuals who are not members of a presumptive group, but who are certified disadvantaged on a case-by-case basis, based on the following standards: (i) disadvantage must stem from his or her color, national origin, physical handicap, long-term isolation from the mainstream of American society beyond the individual's control; and (ii) demonstrated personal experience of disadvantage based on the above; and (iii) disadvantage must be sustained and substantial, not fleeting or insignificant; (iv) and disadvantage must have negatively affected his or her entry into and/or advancement in, the business world; (b) any individual who is a member of a minority group as defined in this Article is rebuttably presumed to be disadvantaged.

Chapter 12¼–2.r. Plaintiffs argue the ordinance uses unconstitutional racial and gender classifications in that there is no proper factual predicate for their use and thus no compelling interest in their use and they are not narrowly tailored to address the problem identified. Defendant argues that continuation of discrimination has been shown; that it thus has a compelling interest in resolving that problem; that its solution is narrowly tailored to the problem; and that the resort to criteria otherwise contrary to the equal protection clause of the fourteenth amendment is, therefore, justified. *See Croson*, 488 U.S. at 469, 109 S.Ct. at 707–08.

## C. *Croson*

*Croson* involved a constitutional challenge to a set-aside ordinance which required prime contractors with the city to subcontract a minimum of 30% of the dollar amount of the contract to one or more minority-owned firms. *Id.* at 477, 109 S.Ct. at 712. The city was found to have failed to establish a "compelling state interest" in enacting this race-conscious measure in the absence of a factual predicate to justify it. *Id.* at 505, 109 S.Ct. at 727. General assertions of societal discrimination or of discrimination in an industry as a whole were held not to justify resort to racial quotas to remedy the effects of *past* discrimination. *Id.* at 499, 109 S.Ct. at 724. Specific evidence that the city was at least passively participating in discriminatory practices within the local construction industry would, however, justify "affirmative steps to dismantle such a system." *Id.* at 492, 109 S.Ct. at 720. "Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise." *Id.* at 509, 109 S.Ct. at 729. As Richmond had not shown such a disparity, nor other evidence of current discriminatory practices within the remedial scope of the ordinance, it was held to be unconstitutional. Nonetheless, enactment of set-aside ordinances, beneficially based on race and/or gender, would meet constitutional standards so long as the city had a "strong basis in evidence for its conclusion that remedial action was necessary" and the action taken was "narrowly tailored" to meet that goal. *Id.*

## D. *Factual Substantiation For Ordinance*

██ Chapter 12¼ was adopted on the following findings:

1. Long entrenched and widespread patterns of racial and gender discrimination in the New Haven construction industry;

2. Inability of race-neutral alternatives to achieve desired goals;

3. The substantial lack of MBE and WBE participation in commercial contracts where there were no set-aside programs;

4. The effectiveness of set-aside programs in increasing the participation of MBEs and WBEs in the construction industry; and

5. The need to prevent irreparable injury to MBEs and WBEs while the City continues to study race and gender discrimination in the New Haven construction industry.

Aldermen's Committee Report at 28.

Plaintiffs here claim the city has not established a sufficient factual predicate for the enactment of Chapter 12¼. A committee established by the city conducted hearings at which representatives of minority and women-owned construction firms testified about the current state of discrimination in the construction industry in New Haven. Instances of workers' tools being stolen from job sites and inability of minority and women-owned firms to get loans were noted. Individuals were targets of mistreatment. A job site sign proclaimed "no niggers allowed." Questionnaires were obtained from minority and women-owned businesses. The results of hearings by the commissions on equal opportunities and human rights were reviewed. Dr. Jaynes, a professor of African–American studies at Yale University, reported on minority and female participation in the New Haven construction industry.[2] He described the history of discrimination since the late 1800s in the United States, Connecticut, and New Haven and examined discrimination in the construction industry in New Haven from the 1970s to 1989. The low numbers of minority contractors in the 1970s were attributed to inadequate, or lack of, schooling, proper guidance, or counseling and apprenticeship training. Discrimination in the industry was found to exist in the 1970s. *See* Exhibit B at 14, 28, 34. However, no statistics such as those required by *Croson* were available. Al-

---

2. Defendant's Exhibit B.

though Chapter 12½ appears to have increased the percentages of contracts received by minority and women-owned businesses from the city in the 1980s, Dr. Jaynes concluded that discrimination in the industry existed in 1989 and recommended a set-aside ordinance to rectify same.

Plaintiffs claim this factual predicate is inadequate. They argue that "anecdotal evidence," such as testimony that minority and women contractors experienced discrimination does not justify a set-aside ordinance. In addition, they argue that absent a demonstrated statistical disparity between the percentage of city contracts received by minority and women-owned businesses and the number of such businesses available to do the work, a race and/or gender conscious remedial statute is not justified. According to plaintiffs, Chapter 12¼ was not "written on a clean slate" and the city was not authorized in 1990 to enact a new set-aside ordinance, since, at that time, there was no showing of a statistical disparity which may have justified Chapter 12½. As noted above, no present statistics compliant with *Croson* are found in the record.

■ As of 1989, MBEs and WBEs were receiving a share of the city's contracts in proportion to the numbers of firms in existence. These percentages of participation are in keeping with figures held not to justify a set-aside program. *See Harrison & Burrowes Bridge Constructors v. Cuomo,* 743 F.Supp. 977, 999–1000 (N.D.N.Y. 1990). Chapter 12½, which mandated that contractors hire minority and women subcontractors, was no doubt a cause of the lack of statistical disparity. However, the lack of statistical disparity can just as readily be explained by the elimination of discrimination due to a change in attitudes. *Croson* does not provide much guidance for a city which attempted, through a set-aside ordinance, to ease or eliminate discrimination, when it comes time to consider extending an old ordinance or enacting a new one. Clearly, a measure intended to rectify discrimination—using a suspect category to create a preference—can be justified only so long as the discrimination continues. "[D]eviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter, a measure taken in the service of the goal of equality itself." *Croson,* 488 U.S. at 510, 109 S.Ct. at 730. However, a general assertion of past discrimination in an entire industry is not a valid basis for determining the precise scope of a present injury for which a remedy is sought. *Id.* at 498, 500, 109 S.Ct. at 723, 724; *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1848–49. May a city that now lacks the relevant statistical disparity nonetheless re-enact a set-aside ordinance if it has other evidence of discrimination? The City of New Haven, in determining whether a continuation of a set-aside ordinance was justified, looked to facts other than statistics which tend to indicate the continued existence of discrimination in the construction industry. Thus, the city argues, the lack of statistics as discussed in *Croson* does not truly reflect the community's attitudes, which, in the absence of a set-aside ordinance, would give rise to a rejuvenation of discrimination. If strictly limited to a finding of discrimination on the basis of statistics, the city, which has brought about a statistical correction of previous discrimination, would be precluded from enacting a continued set-aside ordinance. If the problem has been corrected and discrimination were indeed eradicated, there would be no need for another ordinance. If the "correction" is incomplete, however, the city might be unable to show that, as per *Croson,* it needs an ordinance which would be further corrective.

■ *Croson,* in part, cited Richmond's failure to demonstrate a statistical disparity between the number of minority contractors and the percentage of contracts awarded to MBEs. Plaintiffs argue that the lack of such statistical disparity here requires the downfall of Chapter 12¼. *Croson*'s message, however, is broader: "states ... may take remedial action when they possess evidence that their own spending practices are exacerbating a pattern of prior discrimination [once] they ... identify that discrimination, public or private, with some specificity." *Croson,* 488 U.S. at 504, 109 S.Ct. at 727. A municipality "can use

its spending powers to remedy prior discrimination, if it identifies that discrimination with ... particularity." *Id.* at 492, 109 S.Ct. at 720. Statistics such as discussed in *Croson* are but one type of evidence on which a city may rely. Where, as defendant here argues, statistics do not realistically indicate whether discrimination exists, it would be unreasonable to hold that the city is barred from enacting a race or gender-conscious statute if there is other evidence of discrimination. *Croson* rejected an ordinance that was based on an "amorphous class [of] ... past discriminations." *Id.* at 499, 109 S.Ct. at 724. What is required to avoid "a patchwork of racial preferences based on statistical generalization," *id.*, is evidence of identified discrimination. *Id.* at 503, 109 S.Ct. at 726.

Set asides have two essential purposes. One is to nurture MBEs and WBEs in order to ease their creation and entry, here, into the construction business. The other is to permit stabilization so that they can compete over the long run. By guaranteeing a certain amount of business, the set asides encourage formation of new MBEs and WBEs. Once started, MBEs and WBEs are insulated from discrimination by the set asides so that they can develop a capacity to compete equally with other companies in the market.

New Haven's statistics suggest the first stage has been achieved, to a degree. The MBEs and WBEs existing in the New Haven market are able to perform the set-aside contracts. There is, however, no indication of how well the existing MBEs or WBEs would be able to compete within the construction industry without set asides. The record does not reflect whether the existing MBEs and WBEs will be able to attract and obtain business on the basis of relevant competitive criteria, such as price, quality, reliability, without being excluded on the basis of discrimination. What is lacking is information which would suggest that a reasonable level of minority contract awards would not continue, absent a set aside. For example, statistics or other evidence might show that a level of private

contracts commensurate with the number of MBEs/WBEs available and able to do the work are not and/or will not be awarded to them now or in the future. By producing evidence that MBEs and WBEs attempted to win private contracts and were systematically rejected despite their bids having been the lowest, the city might have shown that discrimination exists and, thus, that the need for a set aside existed. There was some evidence that in 1987–88 WBEs and MBEs received only 17% and 27%, respectively, of their income from private contracts. Though it has not been shown if private contracts exceed, in dollar amount, public contracts, MBEs and WBEs would not seem to be getting contracts from the private sector in any proportion close to the percentage of their participation in public contracts. Without set asides, it could then be argued that contractors on public contracts will award subcontracts more closely following patterns of private sub-contract awards in private contracts, i.e., at a lower rate to MBEs and WBEs, perhaps so low as to constitute the requisite disparity. Such a practice, and likelihood in the future, however, is not established in the record.

The anecdotal evidence gathered by the city does not constitute an adequate factual predicate to justify the enactment of a set-aside ordinance. The testimony of minority and women contractors of their recurring, current, and continuing experiences with discrimination on the job and in vying for contracts, fifteen examples of which are cited by defendant, is not enough. *See Coral Construction Co. v. King County*, 941 F.2d 910, 919 (9th Cir.1991) ("anecdotal evidence may suffice to prove individual claims of discrimination [but] rarely, if ever, can such evidence show a systematic pattern of discrimination necessary for the adoption of an affirmative action plan"); *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 330, 97 S.Ct. 1843, 1852, 52 L.Ed.2d 396 (1977). A set-aside ordinance is not justified to prevent minorities and women from having tools stolen and otherwise being harassed,[3] nor will it

---

3. Although such conduct may reflect racial or gender bias and may, if shown to be systematic,

help minorities and women to get needed loans. As plaintiffs note, eight of the defendant's fifteen examples reflect animus on the part of unions and problems in vocational training, bonding or insurance. These are argued to be entry level problems, not reflective of discrimination in contract awards. Six of the fifteen pertained to on-the-job incidents of individual conduct directed toward minority or women workers. None of these reflect difficulty getting work. Indeed, they occurred while those who testified were at work. Two incidents arose from disputes related to performance where contracts were awarded. Two did suggest that close relations among general contractors resulted in MBE or WBE exclusion. These do not rise to the level of showing of a systemic pattern of discrimination to the exclusion of any other explanation. Once a city identifies discrimination within its jurisdiction, "some form of narrowly tailored racial preference might be necessary to break down patterns of deliberate exclusion." *Id.* 488 U.S. at 509, 109 S.Ct. at 729. Defendant has shown evidence of continuing general societal discrimination, including specific instances of discrimination directed at blacks and women in the construction industry. However, this is not sufficient substantiation from which it might be found that the city has a compelling interest in apportioning public contracts through use of racial and gender goals. *See Croson,* 488 U.S. at 503, 109 S.Ct. at 726.

### E. *Narrowly Tailored*

■ If the factual predicate for finding continued discrimination were sufficient to justify a set-aside ordinance based on race or gender, the remedy chosen is sufficiently narrowly tailored, in part, to justify the classifications included in Chapter 12¼. However, the ordinance extends benefits to "disadvantaged individuals," defined as the physically handicapped and the "long-term isolat[ed] from the mainstream of American society." The ordinance does not further define these terms. Although these

are not "suspect classifications" which must be analyzed under "strict scrutiny," there is no evidence that these people, whomever they may be, have experienced discrimination in New Haven's construction industry. *See Croson,* 488 U.S. at 506, 109 S.Ct. at 727–28. Thus, the inclusion of these classifications is not shown to relate to the city's goal of reducing specific, identified discrimination. *See San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 445–46, 105 S.Ct. 3249, 3257, 87 L.Ed.2d 313 (1985). The ordinance is, therefore, in these respects not narrowly tailored. A discriminatory classification is valid only if those benefitted are actually suffering a disadvantage related to the classification. *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724–25, 728, 102 S.Ct. 3331, 3338, 73 L.Ed.2d 1090 (1982). This is not shown as to the physically handicapped nor to the long-term isolated. To the extent it benefits these two groups, the ordinance would not stand.

■ Plaintiffs further argue that Chapter 12¼ is not narrowly tailored to remedy race and female discrimination because (1) the city failed to consider the use of race-neutral means before enacting the set-aside ordinance and (2) it employs a rigid quota. Dr. Jaynes reports that, as far back as the late 1960s, the city actually implemented race-neutral alternatives. *See* Defendant's Exhibit B at 55. An Office of Business Development was created to provide counseling and assistance to minorities operating small businesses. Funds were provided to private and quasi-public organizations that offered advice and provided consulting services to small businesses. Moreover, the city provided funds to the Greater New Haven Business and Professional Association in an attempt to increase minority business participation. By the late 1980s, the city had in place three small business assistance corporations—the New Haven Development Corporation, the New

legitimately be a basis on which a set aside is based, the city here has not shown the conduct

to be systematic nor has it excluded all non-discriminatory explanations for such conduct.

Haven Community Investment Corporation, and the Technology Investment Fund. The ordinance mandates that the Equal Opportunity Commission in New Haven assist New Haven Community agencies in the effort to increase participation by minority and women firms in the construction industry. Chapter 12¼ also directs the commission to advocate and monitor changes to the state's statutes as recommended by the New Haven Board of Aldermen with respect to bonding assistance and other race-neutral alternatives. *See* Chapter 12¼–3. Other easing of the paths of the MBEs and WBEs in bonding, insurance, bidding, and available capital were tried. Report of Dr. Jaynes at 55. Further, the ordinance's beneficiaries have been limited to those certified as serving New Haven, Chapter 12¼–2.g.(iii), and the Aldermen found it was those who came to benefit. *See* Aldermen's Committee Report at 19.[4] The ordinance further excludes MBEs which gross over $3,000,000. *Cf. Milwaukee County Pavers Ass'n v. Fiedler*, 707 F.Supp. 1016 (W.D.Wis.), *aff'd*, 922 F.2d 419 (7th Cir. 1991). Plaintiffs do not argue an overreach in the goal percentages set. In the consideration of alternatives narrow tailoring is found. *Croson*, 488 U.S. at 507, 109 S.Ct. at 728.

Plaintiffs argue last that the waiver provisions in Chapter 12¼ are not sufficient to overcome its rigid quotas, though they concededly "are an improvement over those of the City of Richmond." Plaintiffs' Reply Brief at 20. The waiver provisions are similar to those upheld in *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), in that they specifically apply where a minority or women-owned firm's price is higher and the higher price is not attributable to past discrimination. A contractor or developer must only make "maximum practicable efforts" to meet the stated "goals." Chapter 12¼–2.u,5. Such efforts include advertising jobs, soliciting

interest, and providing those who are interested with adequate information about the job. If no minority or women-owned firm is available to do the work, the set-aside may then be waived. *Croson*, 488 U.S. at 489, 109 S.Ct. at 718. Moreover, a decision not to waive the set aside may be appealed to the Contract Compliance Subcommittee. *See* Chapter 12¼–4. Chapter 12¼ is in this respect sufficiently narrowly tailored.

### Conclusion

Defendant has not offered sufficient evidence of actual, present or likely future continuation of discrimination against minorities and women in the construction industry to meet the requirements of *Croson*. Beyond minorities and women, there is no evidence of discrimination of the protected groups. Though the evidence required by *Croson* may be hard to come by, due to the city's good faith effort to correct past discrimination by enactment of Chapter 12½, *Croson* still requires sufficient evidence, of whatever nature, to show identified discrimination before suspect classifications can be used to correct that discrimination. This is not to suggest a finding here that discrimination has been eradicated nor that the amount of construction contracts awarded to MBEs and WBEs without set asides in place will remain at levels which are not disparate to the number of MBEs and WBEs available to do the work. The city is continuing to monitor the situation. The ordinance would expire in 1993 and would thus require an up-to-date showing to continue the ordinance beyond that date. What is here decided is merely that the city has not supplied what *Croson* requires and that there is thus no basis to find that Chapter 12¼ was enacted on a sufficient showing of identified discrimination. Thus, Chapter 12¼ is found to be unconstitutional in its violation of the equal protection clause.

---

**4.** To the extent plaintiffs claim that Chapter 12¼ is not narrowly tailored because it is not restricted to minority and women-owned firms in New Haven, restricting the benefit to the State of Connecticut is found to be sufficiently narrowly tailored under *Croson*. *Croson* found

the City of Richmond ordinance was too broad because minorities from anywhere in the United States could take advantage of it. An ordinance restricting the benefit to the State of Connecticut hardly compares.

Accordingly, summary judgment, to the foregoing effect, will enter for plaintiffs. Plaintiffs' motion for summary judgment (document # 110) is granted.

It would be inappropriate to end this matter without acknowledgement of the contribution and aid to the court's consideration of this case from the amicus briefs filed.

SO ORDERED.